## MATTER OF MIETUS

## In Deportation Proceedings

## A-14019286

### Decided by Board June 16, 1966

Respondent's deportability under clause (2) of section 241(c), Immigration and Nationality Act, is established since he has failed and refused to fulfill his marital agreement which is deemed to have been made for the purpose of procuring entry as an immigrant where he married his United States citizen spouse by civil ceremony in Poland in 1963, a religious ceremony, being then precluded by the recent death of her father, to be performed after entry; for some time before his proposal and marriage he had been registered with the U.S. consul for an immigrant visa, during which period, as well as at the time of his arrival in this country in April 1964, the quota to which he was chargeable was oversubscribed; on the same day of the marriage, his wife traveled to Warsaw for the purpose of petitioning to accord him nonquota status; he has never lived with his wife; and he stated in 1965 he was not willing to marry his wife in a religious ceremony and that he was not willing to live with her without a church wedding.

CHARGE:

Order: Act of 1952—Section 241(c) [8 U.S.C. 1251(c)]—Failed or refused to fulfill marital agreement made to procure entry as immigrant.

This case is before us on the appeal of the Service from a decision of a special inquiry officer terminating the proceeding.

The respondent is a 25-year-old married male, native and citizen of Poland, who entered the United States on April 10, 1964 at which time he was admitted as a nonquota immigrant. He had secured nonquota status on the basis of his marriage to a United States citizen on November 6, 1963 in Poland. The Service takes the position that the respondent's marital agreement with his wife, Helen Mietus, was made for the purpose of procuring his entry as an immigrant and that the respondent failed and refused to fulfill the marital agreement. The special inquiry officer concluded that the charge stated in the order to show cause was not sustained and terminated the proceeding. The sole issue is whether this action was correct.

Before discussing the evidence, we consider a comment necessary concerning the burden of proof in cases under section 241(c) of the Immigration and Nationality Act, particularly since certain statements relating to the matter in the special inquiry officer's decision and in the trial attorney's brief appear to be ambiguous and inaccurate. We discussed this burden of proof in *Matter of M—*, 7 I. & N. Dec. 601, 606 (1957), and held that, under clause (1) of Section 241(c), the Government must prove alienage and that there exists the contemplated relation, in point of time, concerning marriage, entry and annulment, and thereafter the burden is on the alien to establish that the marriage was not contracted for the purpose of evading any provisions of the immigration laws; that this is because the alien is required to show that he comes within the statutory exemption; and that under clause (2) the Government has the usual burden of establishing deportability. Since this deportation proceeding is based on the second clause of section 241(c), we hold that the Government has the burden of establishing deportability by reasonable, substantial and probative evidence in accordance with the requirements of section 242(b)(4).

We have carefully reviewed the entire record. The only evidence is the respondent's statement of May 4, 1965 (Ex. 2) and his testimony and that of his wife at the hearing. Certain facts are not in dispute. The respondent's wife was born in Poland on March 31, 1939 and acquired United States citizenship through her parents. She first came to the United States in February 1961 and returned to Poland in August 1963 because of the illness of her mother. Her father had died in May 1963. She had known the respondent since childhood and part of the time they were in the same classes in school. On her return to Poland in August 1963, she saw the respondent frequently since she was friendly with his sister. Near the end of October, he proposed marriage. They were unable to have a religious marriage ceremony because of the recent death of her father but it was agreed that such a ceremony would be performed after he arrived in the United States, and they were married in Poland in a civil ceremony on November 6, 1963. On the evening of the same day, the respondent's wife took the train for Warsaw to make out an application for him [presumably a visa petition] at the American Embassy (Tr. pp. 52–53). During a short trip thereafter, they had sexual intercourse on one occasion. The respondent's wife left Poland on November 12, 1963 for the United States, and the respondent arrived in this country on April 10, 1964. The respondent's wife and other relatives met the respondent at the airport upon his arrival and he spent that night at her apartment. On the following.

day, he went to his sister's home. They have not had sexual intercourse since he came to the United States and have not lived together.

The respondent was questioned on May 4, 1965 (Ex. 2) as to why no religious ceremony was performed after he arrived in the United States. He stated that, at the time of his arrival in this country in April 1964, his wife had a vacation of two weeks and wanted very much to get married during that period but that he could not go through with the ceremony because he felt that he did not know her well enough; that he only had $4.00 when he came to the United States and wanted to defer the marriage until he had earned some money; that subsequently she threatened to have him deported if he did not marry her in a religious ceremony; and that he heard from his brother in Poland that his (the respondent's) wife was pregnant.

With reference to the alleged pregnancy of his wife, it has developed that she was not pregnant and has never been pregnant. She testified that she had not had sexual intercourse with anyone except on the one occasion previously mentioned when she had intercourse with the respondent. The respondent's testimony (Tr. pp. 81-85) is to the effect that about two months after his arrival in the United States he received a letter from his brother in Poland to the effect that his wife was pregnant. In his previous testimony on May 4, 1965, the respondent stated that his brother in Poland had received this information from someone who had written to him but the respondent did not know who it was. The respondent's wife returned to the United States in November 1963, a few days after her marriage to the respondent. Since they had had sexual intercourse on one occasion, he was asked why he believed he was not the father of the child. He said that the letter stated that his wife was then four months pregnant. It seems a little peculiar to us that on some unspecified date from an unknown place (presumably in the United States) an unknown person wrote to the respondent's brother in Poland that the respondent's wife was pregnant and that the unknown individual was even able to specify that she was four months pregnant, particularly when it has developed that she was not pregnant.

There is some conflict in the testimony as to the events occurring subsequent to the respondent's arrival in the United States. The testimony of the respondent's wife is to the effect that she saw him about four times during the period of about two months after his arrival; that she saw him during the summer of 1964 at picnics but he avoided her; that she visited him when he was in the hospital in the autumn of 1964; and that in April 1965 she saw the respondent at a conference which had been arranged at the office of Mr.

Kowal of the Immigrants Service League. The testimony of the respondent is to the effect that the meeting with Mr. Kowal took place about June 1964; that, up to that point, he had seen his wife each week on Saturdays and Sundays; that, at the meeting with Mr. Kowal, his wife threatened to have him deported; and that he then decided he would not go through a religious ceremony nor live with her.

The special inquiry officer stated that there did not appear to be any discrepancy between the testimony of the respondent and his wife, and he did not make any finding regarding their credibility. The Service urges that there are conflicts between their statements and that the respondent is not credible. In connection with the contention that the respondent is not credible, the Service asserts that he lied about the date of the meeting with Mr. Kowal and also falsely stated on May 4, 1965 that the marriage had not been consummated whereas he admitted at the hearing that he and his wife had had sexual intercourse on one occasion in Poland after the marriage. With respect to the meeting at Mr. Kowal's office, we do not believe that the record is clear whether the respondent saw him on only one occasion or whether he may have seen him more than once. In any event, the respondent's wife stated that just before the respondent entered the hospital [autumn of 1964] she had him go to Mr. Kowal (Tr. p. 30). Insofar as concerns the respondent's testimony on May 4, 1965 that the marriage was not consummated in Poland nor in the United States, the respondent subsequently testified that he understood "consummated" to mean living together in one home (Tr. p. 95). From an immigration standpoint, it would seem that it would have been contrary to the respondent's interest to claim that he and his wife did not have sexual intercourse after the marriage. While consummation of a marriage is usually understood to mean that a marriage has been followed by sexual intercourse of the parties, the term "consummate" also means "to complete". Under the circumstances, we do not believe that either of the matters mentioned by the Service would warrant a finding that the respondent is not credible.

There is one other matter which does raise a doubt as to the respondent's credibility. His testimony on May 4, 1965 (Ex. 2, pp. 4-5) is to the effect that he first saw his wife after she returned to Poland in the fall of 1963; that he did not know her before she left Poland for the United States in 1961; that he knew she was living in the village where he lived but did not know her personally; and that he did not know her during the period when they attended the same school. At the hearing, the respondent testified that he had known his wife

since childhood; that they attended the same school; and that they were in the same class from the fourth grade to the sixth grade (Tr. p. 75). We do not find it necessary to make a determination concerning the respondent's credibility because the conflicts in testimony between the respondent and his wife relate to minor matters, and we will base our decision on the facts which are not in dispute.

In his statement of May 4, 1965 (Ex. 2), the respondent stated that he was then not willing to marry his wife in a religious ceremony; that he was not willing to live with her without a church wedding; that he had registered for an immigrant visa at the American Embassy in Poland about 1962 or 1963; and that he was permitted to immigrate to the United States on the strength of his marriage to his wife. When the respondent applied for his immigrant visa in 1962 or 1963 prior to his marriage as well as at the time of his arrival in the United States, the Polish quota was oversubscribed. By virtue of his marriage to a United States citizen, he was able to secure nonquota status and thus avoid the delay which he would have encountered if he had been forced to await his turn under the quota.

A comment is necessary concerning the meaning of "marital agreement." Here, part of the agreement was that the parties would be married in a religious ceremony after the respondent's arrival in the United States. However, the civil marriage entered into in Poland on November 6, 1963 also included, as an essential element of the marital agreement, that the parties took each other as husband and wife in a lasting relationship. This has been the view of the courts. In *Giannoulias* v. *Landon*, 226 F.2d 356, 359 (9th Cir., 1955), the court said: "The 'marital agreement' as that term is used in the statute, plainly means more than the mere indulgement in the marriage ceremony. It means that the contracting parties at least begin in good faith to live together as husband and wife." In *Lutwak* v. *United States*, 344 U.S. 604, 611 (1953), the court had under consideration another statutory provision which permitted the expeditious entry of the alien spouses of veterans of World War II and made the following statement: "The common understanding of a marriage, which Congress must have had in mind when it made provision for 'alien spouses' in the War Brides Act, is that the two parties have undertaken to establish a life together and assume certain duties and obligations."

The pertinent language of section 241(c) of the Immigration and Nationality Act [8 U.S.C. 1251(c)] is as follows: "An alien shall be deported * * * if * * * (2) it appears to the satisfaction of the Attorney General that he or she has failed or refused to fulfill his or her marital agreement which in the opinion of the Attorney General

was hereafter made for the purpose of procuring his or her entry as an immigrant." 8 CFR 3.1(d)(1) provides that, subject to any specific limitation prescribed, this Board "shall exercise such discretion and authority conferred upon the Attorney General by law as is appropriate and necessary for the disposition of the case." In order to sustain the deportation charge against this respondent, the following is necessary: (1) we must be of the opinion that the marital agreement was made for the purpose of procuring the respondent's entry as an immigrant and (2) it must appear to our satisfaction that the respondent failed or refused to fulfill his marital agreement.

Some time before the respondent had proposed marriage to the United States citizen who is now his wife, he had indicated his desire of immigrating to the United States by registering at the American Embassy in Poland for an immigrant visa. On the same day that the marriage ceremony was performed his wife traveled by train to Warsaw for the purpose of executing a visa petition so that he would be accorded 'nonquota status. It is our opinion that the marital agreement was made for the purpose of procuring the respondent's entry as an immigrant. On May 4, 1965, the respondent stated that he was not willing to marry his wife in a religious ceremony and that he was not willing to live with his wife without a church wedding. We are satisfied that the respondent has failed and refused to fulfill his marital agreement.

Insofar as concerns the respondent's attempt to excuse his failure and refusal to fulfill the marital agreement, we held that this deportation charge was not sustained where the alien desired to fulfill the marital agreement and it was the United States citizen spouse who was at fault for the failure to fulfill the agreement. *Matter of M—*, supra. With that exception, the statute does not indicate that there may be circumstances which would warrant an alien's failure or refusal to fulfill his marital agreement. This respondent's case is clearly distinguishable from *Matter of M—* because the respondent has failed and refused to fulfill the marital agreement and his United States citizen spouse desired to fulfill the agreement. In view of the foregoing, we conclude that the respondent is deportable on the charge stated in the order to show cause, and the special inquiry officer's order will be withdrawn.

The special inquiry officer found that the marriage between the respondent and his wife was bona fide. We are inclined to believe that the respondent's wife entered into the marriage in good faith but that the respondent did not. However, it is unnecessary to determine whether the civil marriage in Poland was bona fide since the deportation charge is not dependent on that factor. The respond-

ent applied for voluntary departure and designated Poland as the country of deportation (Tr. pp. 98–99). We find the respondent statutorily eligible for voluntary departure and will grant that relief in the exercise of our discretion.

**ORDER:** It is ordered that the special inquiry officer's order of December 29, 1965, terminating the proceeding, be withdrawn.

*It is further ordered* that the alien be permitted to depart from the United States voluntarily without expense to the Government, to any country of his choice, within such period of time, and under such conditions as the officer-in-charge of the District deems appropriate.

*It is further ordered* that, if the respondent fails to depart when and as required, the privilege of voluntary departure shall be withdrawn without further notice or proceedings and the following order shall thereupon become immediately effective: The respondent shall be deported from the United States to Poland on the charge contained in the order to show cause.